UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JIMMY JAMES JOLIVET JR. § <br> Plaintiff, § <br> § <br> § <br> VS. § <br> § <br> UNION PACIFIC RAILROAD CO. § <br> Defendant § | <br> <br> <br> <br> CIVIL ACTION NO. <br> <br> <br> JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jimmy James Jolivet, Jr. ("Jolivet" or "Plaintiff"), files this Original Complaint against Defendant Union Pacific Railroad, Co. ("Union Pacific" or "Defendant"), and for his causes of action respectfully shows the Court as follows:

### I.
### PARTIES

1. Plaintiff is a Texas resident.

2. Defendant is a corporation doing business in Texas. Defendant can be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

3. Whenever in this Petition it is alleged that Defendant committed any act or omission, it is meant that the Defendant's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification, or approval of Defendant or was done in the routine normal course and scope of employment of the Defendant's officers, directors, vice-principals, agents, servants, or employees.

## II.
## JURISDICTION AND VENUE

4. Jurisdiction is appropriate and proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1331 because this matter is a civil action that arises under the laws of the United States. Jurisdiction is also proper pursuant to 29 U.S.C. § 626(c) because Plaintiff seeks to recover damages or to secure equitable relief under Title VII of the 1964 Civil Rights Act as well as 42 U.S.C. § 1981, as amended, which are acts of Congress which provide for the protection of civil rights.

5. Venue is appropriate and proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391 because Defendant does business in Houston, Harris County, Texas, and because the causes of action alleged herein occurred in Houston, Harris County, Texas.

## III.
## CONDITIONS PRECEDENT TO SUIT

6. All conditions precedent to filing this cause of action have been met.

7. Plaintiff filed an amended complaint of discrimination against Defendant under Charge Number 460-2018-00770 with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC-CRD") on November 20, 2017.

8. On July 12, 2018, the EEOC issued a Notice of Right to Sue letter entitling Jolivet to file an action in this Court for his claims.

9. This action was filed within ninety (90) days of Jolivet's receipt of the Notice of Right to Sue Letter from the EEOC.

## IV.
## SUMMARY OF CLAIMS

10. Defendant has engaged in unlawful employment practices in violation of the Texas Commission on Human Rights Act ("TCHRA"), Chapter 21, of Tex. Labor Code §§ 21.001 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000, *et seq.*, and 42 U.S.C. § 1981.

11. These practices include, but are not limited to the matters listed in this Complaint.

12. No action was taken to correct the prevalent problem.

13. Plaintiff has suffered violations of the Texas Commission on Human Rights Act, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.*, and the Civil Rights Act of 1991, and 42 U.S.C. § 1981 while employed by Defendant.

## V.
## FACTUAL BACKGROUND

14. Plaintiff is a black, African-American citizen of the United States.

15. Jolivet worked for Union Pacific. for 22 years. On or around January 26, 2017, he was terminated.

16. At the time Jolivet was terminated, his job title was Locomotive Manager I.

17. On January 7, 2017, between approximately 1-6 A.M., the bowl set at one of the locations that Plaintiff was watching (Englewood) had the starters go bad. The starters going bad was significant because if the bowl unit could not get started, the yard was going to have to start holding out trains. To prevent this from happening, Manager Zac Helton told Foreman Willie Thymes that he (Thymes) could complete the task of replacing the starters without the use of a crane. This is noteworthy because the Work Policy in the Locomotive Department states that starters may only be replaced by using a crane.

3

18. On January 8, 2017 at approximately 8:30 A.M., Jolivet received a phone call from Zac Helton. Jolivet was informed by Helton that he had authorized that the starters be changed without the use of a crane or other lifting device. This was done without Jolivet's knowledge or approval, and he told Mr. Helton that he should not have authorized that the starters be changed without the use of a crane or other lifting device.

19. On January 12, 2017, Jolivet was questioned by Senior Director Mark Smith ("Smith") about the January 7 incident that occurred at Englewood. During this conversation, Smith asked Jolivet which electrician had been sent to change the bad starters. Jolivet told Smith that Steven Goff was the electrician that had changed the starters. Jolivet then proceeded to get Mr. Goff so that he could meet with Jolivet and Smith.

20. When Goff arrived, he confirmed that he had changed the starters and told Smith that "**Jolivet did not know what we were doing**." (emphasis added)

21. Jolivet did not know that Mr. Goff and the other people working at Englewood were changing the starters without the use of a crane or other lifting device. Had Mr. Goff, Mr. Helton, or anybody working at Englewood that day asked Jolivet for permission to change the starters without the use of a crane or other lifting device, he would have denied such a request.

22. On the evening of January 12, 2017, Plaintiff received a text message from his team leader (Brandon McRae) telling Jolivet to remain at home. The next day Smith called Jolivet and told him "Just stay at home tonight and I'll call you later on until I can sort this out."

23. Jolivet was (unbeknown to him) suspended on or about January 12, 2017.

24. Plaintiff called both Smith and John Estes on January 16 and January 17 respectively to find out what was going on. Neither man called Plaintiff back. However, on January 25, 2017, Jolivet received a phone call from Administrative Manager Leigh Glass telling

4

him to come by the Settegast Shop on January 26, 2017. Upon arriving there, Jolivet was (for the first time) given a letter stating that he had been on "Administrative Leave" from January 12 through January 26, 2017 and that he was terminated as of January 26, 2017.

25. James Klafka was Steven Goff's direct supervisor and is Caucasian.

26. It is important to note that even though Steven Goff was the one who changed the starters in violation of Work Policy in the Locomotive Department policy, he was merely given a letter of reprimand and did not miss even one day of work. Steven Goff is Caucasian.

27. James Klafka was initially dismissed, but was eventually restored to his supervisory position with full benefits (including seniority) and backpay without the need for a hearing.

28. David Knight was a Foreman General 1 and was James Klafka's supervisor. Knight only received a letter of reprimand and did not miss any days of work as a result of the violation of the Work Policy in the Locomotive Department. Knight is Caucasian.

29. Jeff Lewitsky was also a Foreman General 1. He, David Knight, and Steven Goff had all discussed changing the starter in violation of the Work Policy in the Locomotive Department by not using a crane. Nonetheless, Lewitsky also only received a reprimand letter and did not miss even one day of work. Lewitsky is Caucasian.

30. On May 19, 2017, Defendant prepared a letter stating that Jolivet was terminated for "unsafe management." This reason is false and mere pretext to cover up the fact that Jolivet was actually terminated because of his race (African-American), color (Black), and in retaliation for him complaining about Defendant's race discrimination against himself and other racial minorities.

31.     Jolivet's suspension and termination were not the first time Defendant discriminated against Jolivet on the basis of his race and retaliated against him for complaining about its race discrimination. In fact, Defendant's race discrimination and retaliation against Jolivet began years prior to his termination.

32.     Years prior to his termination, Jolivet complained to both EVP and Chief Administrative Officer Eric Butler that there was a lack of racial minorities employed in senior management positions.

33.     On or about December 2014, Jolivet complained to Yvonne Method-Walker, the Director of Diversity for Defendant, that there were only 14 African-American managers out of 210 managers in Jolivet's department. Moreover, out of the 14 African-Americans, there were zero African-American Directors and no African-American Senior Managers.

34.     On or about September 2016, Jolivet also complained to Lance Fritz ("Fritz") about the lack of racial minorities employed in senior management positions.  At the time Jolivet made his complaint to Fritz, Fritz was the CEO and Chairman of Union Pacific. On or about September 2016, Jolivet also complained about the lack of racial minorities employed in senior management positions to Chief Mechanical Officer John Estes. Despite Jolivet's actions, Defendant took no action to remedy this situation.

35.     Jolivet was repeatedly denied the opportunity to promote to a senior management position despite his years of experience. When he repeatedly requested a promotion to a senior management position, he was told by Senior Director Christina Grow "You're too valuable in the field" to promote.

36.     There are numerous examples of Defendant treating its Caucasian employees better than it treats its Black employees. For example, in January 2015, Kevin Kuykendahl

(Caucasian) was (like Jolivet) a supervisor when an employee he was supervising (Mr. Washington) improperly removed a radiator cap in Kuykendahl's presence that resulted in Mr. Washington being burned. Although Mr. Kuykendahl was initially fired, he returned to work and received back pay and benefits. Conversely, Jolivet remains terminated even though he: a) was not present at work on the day of the incident that allegedly led to his termination and b) nobody was injured.

37. In March 2015 there was an incident where 7 employees were injured at a facility that Plaintiff was working at. There were several managers who were determined to have responsibility for the incident. The individuals determined to be responsible included Shop Director Brian Meyer, Senior Manager Christopher Reddick, and Senior Manager Mike Daley. Specifically, it was determined that these individuals "lack of leadership" was the reason for the 7 employees being injured. All of these individuals are Caucasians, and none of them was fired.

38. As discussed previously, on or about September 2016, Jolivet told John Estes, Jr. and Lance Fritz that there were no minorities in senior management. It should be noted that (at a minimum) one member of a racial minority (Jolivet) had applied on multiple occasions for a position in senior management. Despite his years of excellent service, he was never promoted.

39. On or about October 2014, Jolivet applied for the Senior Manager Mechanical Operations position. He did not get the promotion and was told "You are too valuable to lose from the field."

40. On or about May 20, 2010, Plaintiff applied for the Manager of Maintenance position and was given no reason for the failure to promote.

41. On or about February 4, 2010, Jolivet applied for the Manager of Maintenance position and was told "You were our second choice but the company wants to go with this new lean process and Jeff Meyers is the lean guy."

42. On or about September 20, 2007, Plaintiff applied for the Manager of Maintenance position and was given no reason for the failure to promote.

43. On or about August 1, 2007, Jolivet applied for Director Systems Locomotive Shop and was given no reason for the failure to promote.

44. On or about October 4, 2006, Plaintiff applied for Senior Manager Terminal Operations and was given no reason for the failure to promote.

45. On or about August 8, 2016, Jolivet applied for the Senior Manager Mechanical Operations position and was told by Senior Director Mark Smith that he needed more training but that he was the second choice. (It should be noted that he applied for the same position on October 21, 2014.)

46. On or about August 2016, the Senior Manager Mechanical Operations position was given to Mike Daley (Caucasian) even though he had been moved to San Antonio from Houston for being "an unsafe leader."

47. On or about September/October 2016, Jolivet applied for the job that had just been vacated by Mike Daley. Jolivet was not interviewed for the position, and he received a standard rejection letter. When Plaintiff spoke with Mark Smith, Smith told Jolivet "You need more training and development." When Jolivet pointed out to him that he had been to several classes and lead numerous projects with teams that were a success over many years and that all of these were noted in his applications and employment record, Smith replied that he would build

a program to help Jolivet and that since Smith was going to be in Houston a lot that they would visit and go from there.

48. Jolivet reached out to Smith at least 5 times between October 2016 and January 2017, but Smith never visited with Jolivet. The only answers Plaintiff received from Smith were "I got busy", "I forgot", and "I'm still working on it."

49. Even if Jolivet's job performance was deficient based on what happened at Englewood on January 8, 2017 (and it was not), Defendant has allowed other supervisors whose job performance issues were much more serious than Jolivet's alleged job performance issue on January 8 to keep their jobs. The difference between Jolivet and these other individuals is that they are Caucasian and, upon information and belief, they never complained about a lack of racial minorities in senior management positions.

50. Plaintiff was targeted for discrimination and because of his race / color and because he opposed unlawful employment actions.

51. During Plaintiff's employment with Defendant, he has been subjected to disparate treatment regarding compensation, assignments, and promotional opportunities because of his race/color (African American /Black/). Moreover, Defendant terminated Jolivet in retaliation for him opposing Defendant's unlawful acts and in retaliation for him complaining about Defendant's unlawful discrimination.

## VI.
## CAUSES OF ACTION

### DISCRIMINATION BASED ON RACE UNDER TITLE VII

52. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

53. Defendant has engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended. These practices include but are not limited to Defendant's discrimination and harassment of Plaintiff because of his race.

54. The effect of the practices complained of above had been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his race.

## DISCRIMINATION BASED ON COLOR UNDER TITLE VII

55. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

56. Defendant has engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended. These practices include but are not limited to Defendant's discrimination and harassment of Plaintiff because of his color.

57. The effect of the practices complained of above had been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his color.

## RETALIATION UNDER TITLE VII

58. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

59. Plaintiff reported race and color discrimination in violation of Title VII to Defendant, the Texas Commission on Human Rights, and the EEOC.

60. Defendant has unlawfully retaliated against Plaintiff in violation of §704 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a).

61. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status an employee, including, but not limited to the discharge of Plaintiff because he reported and otherwise opposed discriminatory practices and acts in the workplace.

## DISCRIMINATION BASED ON RACE UNDER 42 U.S.C. SECTION 1981

62. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

63. Defendant has engaged in unlawful employment practices in violation of 42 U.S.C. § 1981, as amended. These practices include but are not limited to Defendant's harassment of and discrimination against Plaintiff because of his race.

64. The effect of the practices complained of above has been to deprive Plaintiff of enjoyment of all benefits, privileges, terms, and conditions of his employment contract with Defendants because of his race.

## RETALIATION UNDER 42 U.S.C. SECTION 1981

65. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

66. Defendant has engaged in unlawful employment practices in violation of 42 U.S.C. § 1981, as amended. These practices include but are not limited to Defendant's against Plaintiff because he reported and otherwise opposed discriminatory practices and acts in the workplace.

67. The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status an employee,

including, but not limited to the discharge of Plaintiff because he reported and otherwise opposed discriminatory practices and acts in the workplace.

## VII.
## ATTORNEY'S FEES

68. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

69. As a result of the actions stated above, Plaintiff was forced to employ the undersigned attorney.

70. As a result of Defendant's conduct, Plaintiff is entitled to recover from Defendant his reasonable attorneys' fees for bringing this action pursuant to the applicable statutes.

## VIII.
## DAMAGES

71. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

72. As a result of Defendant's violations of Title VII of the Civil Rights Act of 1964, as amended and violations of 42 U.S.C. § 1981, as amended, Plaintiff seeks the following relief: (1) back pay; (2) promotion, or if promotion is deemed not feasible, front pay; (3) loss of wages and benefits in the past and the future; (4) costs of court, expert fees and attorneys' fees; (5) mental anguish and emotional distress in the past and future (6) any punitive, equitable or liquidated damage provided by law, and (7) pre-judgment and post-judgment interest as allowed by all relevant statutes.

73. Also, since Defendant's actions were committed with reckless indifference to Plaintiff's statutorily protected rights, Plaintiff is entitled to recover punitive damages in an amount sufficient to deter Defendant and others similarly situated from this conduct in the future.

74. Additionally, since Defendant's actions were committed willfully, Plaintiff seeks any additional damages allowed under the relevant statutes.

## IX.
## JURY DEMAND

75. Plaintiffs request a trial by jury on all issues triable by a jury.

## X.
## PRAYER

76. Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear herein, and that after trial by jury, a judgment be entered granting Plaintiff the following:

A. reinstatement by Defendant placing Plaintiff in the position he would have occupied but for Defendant's discriminatory treatment and making him whole for all earnings he would have received had it not been for Defendant's discriminatory and tortious treatment including, but not limited to, wages, bonuses, pension and other lost benefits;

B. actual damages;

C. punitive damages;

D. pre-judgment and post-judgment interest at the maximum rate permitted by law;

E. reasonable and necessary attorney's fees in an amount to be shown to the satisfaction of the court;

F. cost of court; and

G. such other and further relief, both general and special, at law and in equity, to which Plaintiff may show himself justly entitled under all attending facts and circumstances.

Respectfully submitted,

 /s/ Andrew L Mintz
Andrew L. Mintz

Texas Bar No. 24037120
SD TX I.D. No. 35220
andrew@almintzlawfirm.com
ANDREW L. MINTZ, PLLC
2100 West Loop South, Suite 1125
Houston, Texas 77027
Ph: (713) 859-3828
Fax: (832) 626-0389

**ATTORNEY FOR PLAINTIFF
JIMMY JAMES JOLIVET, JR.**